USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  03/17/2023

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
FREE HOLDINGS INC.,                                    :
                                                       :
                         Plaintiff,                    :       **OPINION AND**
                                                       :       **ORDER**
                                                       :
        -v-                                             :       22-CV-881 (JLC)
                                                       :
KEVIN MCCOY and SOTHEBY'S, INC.,                       :
                                                       :
                                                       :
                         Defendants.                   :
----------------------------------------------------------------X

**JAMES L. COTT, United States Magistrate Judge.**

Free Holdings, Inc. has brought this action involving the digital artwork, *Quantum*, and the first non-fungible token ("NFT") ever created. It has sued *Quantum*'s creator, artist Kevin McCoy, and auction house Sotheby's Inc. (collectively, "defendants"). Free Holdings alleges multiple claims stemming from statements made by defendants in promotional material for an auction of *Quantum* and its digital record. Defendants have each moved to dismiss the amended complaint. For the reasons set forth below, the motions are granted.

## I.    BACKGROUND

### A.    Factual Background

The following facts, drawn from the amended complaint ("AC"), Dkt. No. 47, sources cited therein, exhibits attached by Free Holdings to its motion papers, and judicially noticeable matters, are assumed true for the purposes of this motion. *See, e.g., Ebomwonyi v. Sea Shipping Line*, 473 F. Supp. 3d 338, 344–45 (S.D.N.Y. 2020),

1

*aff'd*, 2022 WL 274507 (2d Cir. Jan. 31, 2022).  In evaluating whether the claims are cognizable, the Court also considers Natively Digital: A Curated NFT Sale, "the challenged publication" cited in the amended complaint.  *See, e.g.*, *Biro v. Condé Nast*, No. 11-CV-4442 (JPO), 2014 WL 4851901, at *4 (S.D.N.Y. Sept. 30, 2014) ("In a defamation case, [documents incorporated by reference or considered integral to the complaint] may include the entirety of a challenged publication that is excerpted in the complaint."), *aff'd in part*, 807 F.3d 541 (2d Cir. 2015), *aff'd*, 622 F. App'x 67 (2d Cir. 2015).

### 1.  NFTs and Namecoin

As alleged in the amended complaint, an NFT is a unique identifier that "authenticate[s] digital content" on the blockchain, which is "a digital public ledger maintained on a decentralized computer system and consisting of records called blocks."  AC ¶¶ 27, 29.  "The blockchain's record-keeping and authentication technology serves to provide public certificates of authenticity or proof of ownership of NFTs."  *Id.* ¶ 31.  "[C]ontent linked to NFTs can take the form of digital images of physical objects, music, text, and more."  *Id.* ¶ 32.

Namecoin, an early blockchain, is a system of "names"—unique combinations of numbers and letters—that can be claimed and traded by users.  *See id.* ¶ 35; *see also* Monolithbrah.eth, *et al.*, *Defining "NFT" in Historical Context* ("Defining NFT") (Jun. 27, 2022) https://mirror.xyz/chainleft.eth/MzPWRsesC9mQflxlLo-N29oF4iwCgX3lacrvaG9Kjko.[1]  Ownership of every name periodically expires, at

---

[1] As Free Holdings cites to and attaches this article as an exhibit to its

which point any user "may freely claim [it] on the Namecoin blockchain" by re-registering the expired name.  AC ¶ 4; Defining NFT.  In the community of blockchain users, "there is an ongoing debate" about the status of names that expire and are then re-registered: namely, whether re-registered names become new NFTs or are the same NFTs that were previously claimed.  The debate is summarized in the Defining NFT article as follows:

> Namecoin is designed around domain names, but when a domain name gets registered the first time, it is represented by a particular identifier (UTXO design) to allow its trading.  The chain of these identifiers (UTXOs) can be considered a special coin, which we will call a "colored coin" in this article. . . .
>
> When a Namecoin domain expires, the colored coin becomes unspendable.  In practice, it can be called "burnt", because when the domain name is re-registered later, a new UTXO chain starts.  This would mean that when a domain name expires, the chain of events where that domain was represented breaks.  During the re-registration, the Namecoin protocol does not make a distinction between a never-used domain name and a previously expired domain name.  This fact may support the argument that the expiration is philosophically burning the original token.
>
> On the other hand, as mentioned before, Namecoin is designed around names.  Names are unique identifiers themselves and they function that way immutably in a cryptographically secured blockchain.  The history of the

---

memorandum of law and declaration in opposition to McCoy's motion, *see* Plaintiff's Memorandum of Law in Opposition to Kevin McCoy's Motion to Dismiss the Amended Complaint ("Pl. Mem. McCoy"), Dkt. No. 66, at 8 n.5; Dkt. No. 66-1, Exhibit ("Ex.") C, the Court considers it part of the record in this case.  *See, e.g., Reliance Ins. Co. v. Polyvision Corp.*, 474 F.3d 54, 57 (2d Cir. 2007) (consideration of allegations and exhibits outside complaint permissible because plaintiff "knew additional factual considerations were being considered and, in fact, responded with its own evidentiary submissions").

unique name, previous updates and transactions remain on-chain, as is the case with blockchains.

The aforementioned "UTXO chains" are actually formed of individual UTXO stations. Each UTXO has an address and domain names are attached to these UTXOs. When Bob makes a standard domain name transfer to Alice, a 0.01NMC is spent on Bob's side where the domain name is attached, and a new 0.01NMC is created on Alice's side where the domain name is attached. The thing that physically (for lack of a better term) moves from one address to another during a typical transfer is the domain name, not UTXOs. The design choice of a typical domain name transfer supports the argument that the domain name is the unique identifier and the token, and it never burns even after expiration.

This domain-first design can be seen not only in block explorers but also in functions to utilize the domain names. There's a built-in [remote procedure call ("RPC"), a software communication protocol] method since the beginning of Namecoin called name_show which returns the information about the domain name even during the expired period. This function does not return anything for never-registered domains.

In fact, an expired domain can still be functional. When expired, Namecoin Core will still have the name and return its local state with name_show (just indicating the expired status). If the resolver setup accepts it, the domain will still work. Similarly, expired "id/" names in Namecoin still work as logins, which indicates the usefulness of the name_show function.

Consequently, as the article explains, there are three different interpretations of the significance of ownership of a re-registered name on Namecoin:

Interpretation 1: *The token is the colored coin, and that is the asset.* Names may be unique but they are cryptographically represented by tokens and only that representation matters. Since a re-registered name is

assigned to an entirely new colored coin, the provenance from the earlier UTXO chain is broken, therefore *this is a new asset and cannot claim historical value*.

Interpretation 2: *The token is the name, and that is the asset*. Namecoin is designed around names where names are the main unique identifiers. This is supported by the technical design when you do a typical name transfer or assign a value field to the name. These are all visible on-chain. Further, when the name expires, the data of the name remains on the blockchain. If the blockchain is designed around names and their whole history is on-chain, when the name is re-registered you are simply reactivating the old token, therefore *provenance is not broken*.

Interpretation 3: *The token is the colored coin because it is a cryptographic representation of the name*. But the main collectible asset is the name itself and these names have their own provenance because Namecoin is designed around names as unique identifiers. A name's history and UTXO assignments are all visible on-chain. This is further proven by the existence of name_show and name_history RPC methods. Therefore when the name is re-registered, *the new colored coin (UTXO chain) can be assumed as a new NFT, but it represents the old decentralized collectible asset which was intact and ownable since its birth*.

*Id.* (emphasis added). To summarize, as the Defining NFT article makes clear, some believe that when a new user re-registers an available name previously claimed by someone else, it has claimed the same NFT claimed by the previous user. Others, who believe that the NFT is the UTXO chain, not the name, believe that when a new user re-registers an expired name, the new UTXO chain it creates signifies a new NFT. A third group ascribes to a combination of the two theories: that the UTXO chain becomes a new NFT that retains the entire history of the name.

### 2.  Mccoy's Creation and Preservation of *Quantum*

In 2014, digital artist Kevin McCoy created *Quantum* (viewable at https://static.mccoyspace.com/gifs/quantum.gif).  AC ¶¶ 2, 37.  McCoy was interested in experimenting with the blockchain to store his work because he "thought about how the scarcity mechanism that bitcoin presented could be a way for digital artists to create provenance and ownership systems around digital works."  Declaration of Evan M. Rothstein dated June 30, 2022 ("Rothstein Decl."), Dkt. No. 56, Ex. C, Ex. D ("Kevin McCoy – *Quantum* Tr.") at 3:24–4:3.[2]  Because of this interest, McCoy created the digital record of *Quantum* on Namecoin on May 2, 2014—"the first NFT."  AC ¶¶ 2, 98; *see* Namebrow.se, Namecoin Explorer, https://namebrow.se/name/d41b8540cbacdf1467cdc5d17316dcb672c8b43235fa16cde 98e79825b68709a/ [https://perma.cc/N4J6-5Y3U] ("-709a Record Page") (last visited Mar. 16, 2023) (also viewable at Declaration of William L. Charron dated June 30, 2022 ("Charron Decl."), Dkt. No. 61, Ex. B).[3]  To do this, McCoy entered the "NAME_NEW" and "NAME_FIRSTUPDATE" functions on Namecoin to register the name d41b8540cbacdf1467cdc5d17316dcb672c8b43235fa16cde98e79825b68709a

---

[2] The cited exhibits display a video and corresponding transcript.  The video appears in the "challenged publication" cited by Free Holdings in the amended complaint, *see* AC ¶¶ 52–66, n.5–14.  The Court deems these exhibits to be incorporated by reference in, or otherwise integral to, the amended complaint, and therefore properly considered here.  *See, e.g., Biro*, 2014 WL 4851901, at *4.

[3] The Court considers the -709a Record Page in adjudicating the pending motions, as Free Holdings refers to it in the amended complaint and "relied upon [it] in framing the complaint."  *See* AC ¶ 38 n.3; *see also McLennon v. City of New York*, 171 F. Supp. 3d 69, 88–89 (E.D.N.Y. 2016) (discussing when documents are considered "integral" to complaint).

("-709a") as a digital record of *Quantum*.  -709a Record Page.  The -709a Record

Page provides the following disclaimer:

> An important distinction between property & deed must
> be made when considering Namecoin NFTs.  A UTXO, the
> thing that transfers ownership [between] holders of
> public/private key pairs, is a DEED to property but NOT
> property itself.  The property that the Namecoin
> blockchain was built to cryptographically secure
> ownership of, provided all recurring fees have been paid
> to the protocol, is a unique plot of digital space known as
> a Name.  As such, Names, along with the history of
> Values associated to them, are the NFT property.

-709a Record Page.  On May 28, 2021, McCoy "minted another NFT" to record the

same moving image of *Quantum*, "this time on the Ethereum blockchain."  AC ¶ 6.

### 3.  Claims on Namecoin and Communications on Twitter

In January 2015, name -709a expired.  AC ¶ 3.  On April 5, 2021, a new user

entered "NAME_NEW" and "NAME_FIRSTUPDATE" on the -709a name entry.

-709a Record Page.  On April 30, 2021, a user entered "NAME_UPDATE" and wrote

a message that appears under the "Value" column of that entry:

> I assert title to the file at the URL
> http://static.mccoyspace.com/gifs/quantum.gif with the
> creator's public announcement of it's publishing at the
> URL
> https://twitter.com/mccoyspace/status/4623204267196416
> 00 The file whose SHA256 hash is
> d41b8540cbacdf1467cdc5d17316dcb672c8b43235fa16cde9
> 8e79825b68709a is taken to be the file in question.  Title
> transfers to whoever controls this blockchain entry.

-709a Record Page; AC ¶ 5.  Free Holdings reports that on Namecoin.org, the

command "name_history

d41b8540cbacdf1467cdc5d17316dcb672c8b43235fa16cde98e79825b68709a,"

returns the same message.  Declaration of Moish E. Peltz dated August 15, 2022 ("Peltz Decl."), Dkt No. 66-1 ¶¶ 2–14.[4]

As is displayed on the -709a Record Page and reproduced in the chart below, above the April 30, 2021 entry, several more "NAME_UPDATE" entries appear with dates, codes, and messages.  -709a Record Page.  The entries do not identify authors, but delineate "block" numbers.  *Id.*  For instance, the block number associated with the "NAME_NEW" operation performed on May 2, 2014 is 174910; the block number associated with the "NAME_FIRSTUPDATE" operation performed on May 3, 2014 is 174923.  *Id.*  Then, the "NAME_NEW" operation performed on April 5, 2021 appears at block 553180, and subsequent entries appear next to higher block numbers.  *Id.*  Thus, according to Free Holdings, "all subsequent activity associated with [-709a] is forever linked to that name on the Namecoin blockchain" and "all prior history associated with that name . . . cannot be deleted so long as the Namecoin blockchain continues to operate."  Peltz Decl. ¶ 16.

---

[4] Free Holdings also asserts that the Namecoin Explorer does not "properly display the relevant history of the -709a name" but a "direct interaction with the Namecoin protocol produces . . . a different value . . .  presumably because McCoy committed this text in [a different format]."  Pl. Mem. McCoy at 7; *see also* Peltz Decl. ¶¶ 2–14.  Because Free Holdings cited to the -709a Record Page on Namecoin Explorer in the amended complaint, *see* AC ¶ 38 n.3, the Court considers it here.

| Date/Time | Block | Transaction | Operation | Value |
|---|---|---|---|---|
| Oct. 7, 2022, 1:24 p.m. | 633125 | b9d71b2cd... | NAME_UPDATE | An important distinction between property & deed must be made when considering Namecoin NFTs. A UTXO, the thing that transfers ownership b/w holders of public/private key pairs, is a DEED to property but NOT property itself. The property that the Namecoin blockchain was built to cryptographically secure ownership of, provided all recurring fees have been paid to the protocol, is a unique plot of digital space known as a Name. As such, Names, along with the history of Values associated to them, are the NFT property. |
| Feb. 10, 2022, 3:47 p.m. | 598415 | 6dd5ceffc... | NAME_UPDATE | I assert title to the file at the URL http://static.mccoyspace.com/gifs/quantum.gif with the creator's public announcement of it's publishing at the URL https://twitter.com/mccoyspace/status/462320426719641600 The file whose SHA256 hash is d41b8540cbacdf1467cdc5d17316dcb672c8b43235fa16cde98e79825b68709a is taken to be the file in question. Title transfers to whoever controls this blockchain entry. |
| June 14, 2021, 12:25 p.m. | 563353 | 93e6db4e6... | NAME_UPDATE | **This original NFT, entitled "Quantum" by Kevin McCoy and minted on May 2, 2014, is currently held by the person who controls the Twitter handle @EarlyNFT. Please direct message all inquires about the artwork there.** |
| June 7, 2021, 4:30 p.m. | 562392 | 84adf2532... | NAME_UPDATE | **An authorized print of this original NFT, entitled "Quantum" by Kevin McCoy, is currently being auctioned off by Sotheby's. Good Luck to all the bidders.** |
| April 30, 2021, 2:53 p.m. | 556942 | e63d18c5b... | NAME_UPDATE | I assert title to the file at the URL http://static.mccoyspace.com/gifs/quantum.gif with the creator's public announcement of it's publishing at the URL https://twitter.com/mccoyspace/status/462320426719641600 The file whose SHA256 hash is d41b8540cbacdf1467cdc5d17316dcb672c8b43235fa16cde98e79825b68709a is taken to be the file in question. Title transfers to whoever controls this blockchain entry. |
| April 5, 2021, 12:14 p.m. | 553214 | d81a70169... | NAME_FIRSTUPDATE | None |
| April 5, 2021, 7 a.m. | 553180 | 8c76ba4ec... | NAME_NEW | fc6a09d1dfa2cbced6fa35e64c3cb001196cdef2 |
| May 3, 2014, 1:27 a.m. | 174923 | fa8b9a6ad... | NAME_FIRSTUPDATE | None |
| May 2, 2014, 11:33 p.m. | 174910 | da66d975e... | NAME_NEW | aa4bcd723e172f0f53cbab9c71a165262334206b |

Beginning in April 2021, Free Holdings alleges that it attempted to contact McCoy on Twitter (@mccoyspace) using the handle @EarlyNFT.  AC ¶¶ 44–45.  On April 6, 2021, @EarlyNFT tweeted: "Would you mind enabling PM for me, @mccoyspace? There's a matter regarding your work 'Quantum' I'd like to discuss with you . . . "  *Id.* ¶ 45.  On April 12, 2021, @EarlyNFT replied to one of @mccoyspace's tweets: "Kevin, would you mind allowing me to send you a private message (this option is currently turned off on your end)?  This concerns your NFT artwork with Monegraph back in 2014."  *Id.* ¶ 46.[5]  On April 30, 2021, @EarlyNFT

---

[5] The Court takes judicial notice that on Twitter, a "reply" is a "response to another tweet."  *See* Twitter, About Conversations on Twitter, https://help.twitter.com/en/using-twitter/twitter-

replied to @mccoyspace: "I am in possession of Quantum NFT (the record is found here [link inaccessible by the Court]).  Can we discuss this over messaging (currently your messaging is turned off)?"  *Id.* ¶ 47.  Later on April 30, @EarlyNFT tweeted: "Take a look . . . I just updated the record today: [link inaccessible by the Court]."  *Id.*  On May 3, @EarlyNFT tweeted:



*Id.* ¶ 48.⁶  On May 6, 2021, @EarlyNFT replied to @mccoyspace: "Kevin we

---

conversations#:~:text=A%20reply%20is%20a%20response,the%20prompt%20above %20the%20Tweet (last visited Mar. 16, 2023).  *See also Satan Wears Suspenders, Inc. v. Jaar*, No. 21-CV-812 (ER), 2022 WL 2181449, at *3 n.6 (S.D.N.Y. June 16, 2022) (taking judicial notice of "Twitter post and reply tweets"); *Knight First Amend. Inst. at Columbia Univ. v. Trump*, 302 F. Supp. 3d 541, 552 (S.D.N.Y. 2018) (taking judicial notice of information on Twitter webpage), *dismissed as moot on other grounds*, 2021 WL 5548367 (2d Cir. May 26, 2021).  The amended complaint does not indicate to which of McCoy's tweets @EarlyNFT replied.

⁶ Free Holdings alleges that this tweet was "to McCoy."  AC ¶ 48.  The screenshot of the tweet included in the Amended Complaint does not show whether it was a "reply" to one of McCoy's tweets, or otherwise indicate how McCoy would have been

ABSOLUTELY need to talk . . . Namecoin records expire; I own the Quantum NFT. I can demonstrate it if you give me a chance . . ." *Id.* ¶ 50.  McCoy never responded to the Twitter communications.  *Id.* ¶ 51.

### 4. The Auction and Sale of *Quantum*

In May 2021, the well-known auction house Sotheby's began marketing *Quantum* for an auction entitled *Natively Digital: A Curated NFT Sale*, scheduled for June 2021.  AC ¶¶ 8, 52; *see* Sotheby's, Natively Digital: A Curated NFT Sale, https://www.sothebys.com/en/buy/auction/2021/natively-digital-a-curated-nft-sale-2/quantum [https://perma.cc/B3YA-A9HP]("Natively Digital") (last visited Mar. 16, 2023) (videos and moving image not preserved on Permalink, videos attached as exhibits C and E, with corresponding transcripts at exhibits D and F, to the Rothstein Declaration).[7]  Natively Digital includes the following description below the moving image, *Quantum*:

> Owner: Kevin McCoy
>
> Kevin McCoy
> b. 1967
> *Quantum*
> 2014-21
>
> Non-fungible token ERC-721
> Token ID: 0
> 9 mb Tif + file archive with documentation
> Originally minted on May 3, 2014 on Namecoin

---

made aware of it.

[7] As Natively Digital is cited and discussed extensively in the amended complaint and is "the challenged publication," the Court considers it as part of the record in adjudicating the pending motions.  *See, e.g.*, *Ebomwonyi*, 473 F. Supp. 3d at 344–45; *Biro*, 2014 WL 4851901, at *4.

blockchain, and preserved on a token minted on May 28, 2021 by the artist.

Sotheby's marketed *Quantum* as "the most art historically important work in the history of NFTs." AC ¶ 59 (quoting Natively Digital). The Catalogue Note for *Quantum* provides the following description:

> In the long timeline of art, there are few works that serve as genesis blocks to their own chain of history. They are seismic forks in direction; forks that usher in new movements that block by block, mint by mint, usher in new art histories. These works close chapters on the art histories that came before, while anchoring a new flowering of human creativity. These prime movers occupy a singular position in art history. They came first. Kevin McCoy's *Quantum* is such a work. Minted on 2nd May 2014 21:27:34, or more precisely Namecoin Block 174923, the NFT era quietly dawned. What a noise it makes today.

AC ¶ 58 (quoting Natively Digital, Catalogue Note).

A "Condition Report" on Natively Digital, authored by nameless TM, explains *Quantum*'s digital history, in relevant part:

> The hash and all the information about [*Quantum*] are stored on the Ethereum blockchain, and therefore cannot be modified. This token was minted May 2021, but the referenced pieces were originally made public in 2014, with a link to the image hosted on the Namecoin network. The token is a very early example of utilizing a blockchain token to identify the provenance of a piece of art. Documents contained within the media bundle hosted on [the InterPlanetary File System] indicate the date and block location that the Namecoin DNS pointer was set to point to mccoyspace.com, and shows the transactions used at the time to create this trail. To avoid domain squatting, Namecoin was designed to include removal of pointers after 36,000 blocks. Accordingly, this specific Namecoin entry was removed from the system after not being renewed, and was effectively burned from the chain.

Natively Digital; AC ¶¶ 64–65.

McCoy appears in two videos on Natively Digital.  *See* Rothstein Decl., Ex. C–F.  In one video, McCoy describes the "restoration and preservation efforts that [he] made to bring this early work back into the present day."  *Id*., Ex. E, Ex. F ("*Quantum* Token – McCoy Tr.") at 2:4–6.  On his computer screen, McCoy shows the viewer how he "moved the original on-chain data from a burned Namecoin token into a modern, industry standard, ERC 721 token, while preserving all of the original on-chain information."  *Id*., Ex. E, *Quantum* Token – McCoy Tr. at 2:8–12; *see also* AC ¶ 66 (quoting same).  McCoy explains that the "provenance chain . . . begins on Namecoin but now is irrevocably transferred to this more modern and stable specification on the Ethereum blockchain."  *Quantum* Token – McCoy Tr. at 3:23–4:2.  McCoy displays

> an archive called 'wallet documentation[,]' that contains a set of screenshots taken from the original Namecoin wallet showing the original transaction set, the original on-chain data, and a signed message proving that [he] ha[s] continued possession of the private key for the address that originally sent *Quantum*'s minting transaction.  That signed message appears separately in the archive as a text file and the data of which can be used in a contemporary Namecoin wallet to independently verify the message's validity.

Rothstein Decl., Ex. E, *Quantum* Token – McCoy Tr. at 4:3–15.  McCoy concludes: "[a]s we enter into this new era of tokenization, I think we will increasingly be faced with issues of cross-chain translation, preservation, and archiving and conservation. In fact, we're already there with *Quantum*."  *Quantum* Token – McCoy Tr. at 5:3–8.

Sotheby's held the auction for *Quantum* from June 3–10, 2021.  AC ¶¶ 77–78.

On June 17, 2021, Free Holdings allegedly spoke to Caroline Moustakis ("Moustakis"), Sotheby's Senior Vice President, and told her "that the description that Sotheby's posted . . . was inaccurate and misleading because [the record of *Quantum* on Namecoin] had not been 'burned' or 'removed' from the Namecoin blockchain, but rather was still active and controlled by Free Holdings."  AC ¶ 79. "Free Holdings requested that Sotheby's make public statements to correct the record, including making a statement that the [the record of *Quantum* on Namecoin] remains active and in private hands, was not listed for sale as part of Sotheby's auction, and that the item Sotheby's auctioned was in fact an authorized print of the Namecoin-*Quantum* token."  *Id.*  Free Holdings then emailed Moustakis, memorializing the conversation and requesting that the public record be corrected, but neither Moustakis nor any other Sotheby's representative responded. *Id.* ¶¶ 80–81.

On August 23, 2021, McCoy and Sotheby's sold the "re-minted" *Quantum* to Alex Amsel ("Amsel"), who uses the Twitter name @Sillytuna, for a reported sum of $1,472,000.  AC ¶ 84.  Amsel tweeted: "First ever crypto art nft – Quantum has arrived chez Sillytuna. Take that VISA!"  AC ¶ 86.

After the sale, an article in the *New York Times* reported that the "first NFT that Kevin [McCoy] created . . . sold last June at Sotheby's for $1.4 million."  AC ¶ 95; ¶ 95 n.15 (citing Blake Gopnik, *One Year After Beeple, the NFT Has Changed Artists. Has It Changed Art?*, N.Y.TIMES (Mar. 3, 2022) https://www.nytimes.com/2022/03/03/arts/design/nft-art-

beeple.html?msclkid=eacb622dcf0a11ec93b64ee394548d56 ("Gopnik")).[8]  A segment

on Fox Business ran the banner: "FIRST-EVER NFT 'QUANTUM' SOLD FOR

$1.47 MILLION."  AC ¶ 97.  Free Holdings alleges that it expended $5,311.49

"seeking to have McCoy and Sotheby's issue public statements correcting their false

and misleading claims."  *Id.* ¶ 100.

On May 6, 2022, nameless tweeted:

> "Last year, nameless prepared a condition report in
> connection with the Sotheby's auction of Kevin McCoy's
> Ethereum-based 'Quantum' NFT [(hyperlink to Natively
> digital)].  McCoy's 'Quantum' NFT was originally created
> on the Namecoin blockchain.  The condition report
> included a statement that Quantum's 'specific Namecoin
> entry was removed from the system after not being
> renewed, and was effectively burned from the chain.'  In
> light of subsequent allegations challenging this
> statement, nameless has decided to retract its condition
> report.  [N]ameless expresses no opinion about the merits
> of the allegations.

AC ¶ 88.

## B.    Procedural History

Free Holdings, a Canadian corporation, originally brought this action against

McCoy; Sotheby's; nameless, a corporation based in Colorado; and Alex Amsel, the

buyer of the *Quantum* NFT, on February 1, 2022, challenging their

characterizations that they were involved with the first NFT, and that the

Namecoin record associated with *Quantum* had been "burned" or "removed."

---

[8] Where it is not otherwise incorporated in the pleadings, a court may "take judicial
notice that an article was published," but may "not take judicial notice of the truth
of the facts in the article."  *Karol v. City of New York*, 396 F. Supp. 3d 309, 318
(S.D.N.Y. 2019) (citing *Staehr v. Hartford Fin. Servs. Group, Inc.*, 547 F.3d 406, 425
(2d Cir. 2008)).

Complaint ("Compl."), Dkt. No. 1; *see also* AC ¶¶ 60–70. On March 8, 2022, Free

Holdings voluntarily dismissed its claims against Amsel. Dkt. No. 24. On April 6,

2022, the parties consented to my jurisdiction for all purposes pursuant to 28 U.S.C.

§ 636(c). Dkt. No. 38. On May 9, 2022, Free Holdings filed an amended complaint,

in which it asserts five causes of action: (1) unjust enrichment (¶¶ 110–16); (2)

slander (¶¶ 117–26); (3) deceptive and unlawful trade practices under New York

General Business Law ("G.B.L.") § 349 (¶¶ 127–39); (4) commercial disparagement

(¶¶ 140–48); and (5) false or misleading representations under 15 U.S.C. § 1125(a)

(¶¶ 149–58).[9] Dkt. No. 47. It further requests that the Court:

> declar[e] and adjudicat[e] that (i) Free Holdings is the
> rightful owner of the Namecoin-based *Quantum*; (ii) the
> Namecoin-*Quantum* has not been burned or otherwise
> removed from the Namecoin blockchain; and (iii) the
> statements issued by McCoy and Sotheby's in connection
> with their sale of the Ethereum-*Quantum* were false and
> misleading[;]

and seeks damages and injunctive relief. *Id.* at 24–25.[10]

On May 10, 2022, Free Holdings dismissed its claims against nameless. Dkt.

No. 48. On June 30, 2022, McCoy and Sotheby's both moved to dismiss the

amended complaint under Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil

Procedure, Dkt. Nos. 54, 59, and filed accompanying memoranda of law,

---

[9] As its first cause of action, Free Holdings asserts "Declaratory Judgment," which
is not a cause of action but rather a form of relief. *See, e.g.*, *Cisco Sys., Inc. v.
Synamedia Ltd.*, 557 F. Supp. 3d 464, 474 (S.D.N.Y. 2021) ("A request for relief in
the form of a declaratory judgment does not constitute an independent cause of
action.") (citing *In re Joint Eastern and Southern Dist. Asbestos Litig.*, 14 F.3d 726,
731 (2d Cir. 1993)).

[10] This citation refers to page numbers of the amended complaint as the paragraphs
seeking relief are not numbered.

declarations, and exhibits of various sources cited in the amended complaint.  *See* Defendant Sotheby's Inc.'s Memorandum of Law in Support of its Motion to Dismiss the Amended Complaint ("Sotheby's Mem."), Dkt. No. 55; Rothstein Decl., Dkt. No. 56; Defendant Kevin McCoy's Memorandum of Law in Support of his Motion to Dismiss ("McCoy Mem."), Dkt. No. 60; and Charron Decl., Dkt. No. 61.[11]  On July 7, 2022, the Court accepted video footage as exhibits to the motion papers, including those filed by Sotheby's, annexed to the Rothstein Declaration.  Dkt. No. 62.  On August 16, 2022, Free Holdings filed memoranda of law in opposition to both motions to dismiss and an accompanying declaration.  *See* Pl. Mem. McCoy; Peltz Decl., Dkt No. 66-1; Plaintiff's Memorandum of Law in Opposition to Sotheby's Inc.'s Motion to Dismiss the Amended Complaint ("Pl. Mem. Sotheby's"), Dkt. No. 64.  On September 1, 2022, Sotheby's and McCoy each filed a reply memorandum of law.  Dkt. Nos. 68, 69.

## II.    DISCUSSION

In their respective motions, defendants contend that Free Holdings has failed to allege an injury sufficient for standing or a claim that is ripe for review, warranting dismissal for lack of subject matter jurisdiction under Rule 12(b)(1).  In the alternative, they argue that all of Free Holdings' claims should be dismissed under Rule 12(b)(6) for failure to state a claim.  For the following reasons, the Court concludes that Free Holdings has not alleged an injury sufficient for standing to

---

[11] While they filed separate motion papers, Sotheby's and McCoy joined in each other's motions as well.  Dkt. Nos. 54, 55 at 1; Dkt. No. 60 at 1.

sue.  The Court further concludes that even if Free Holdings had standing, it has failed to state a claim upon which relief can be granted.

### A.  Legal Standards

#### 1.    Motion To Dismiss For Lack Of Subject Matter Jurisdiction

"Dismissal of a case for lack of subject matter jurisdiction under Rule 12(b)(1) is proper when the district court lacks the statutory or constitutional power to adjudicate it." *Gelmart Indus., Inc. v. Everready Battery Co., Inc.*, No. 13-CV-6310 (PKC), 2014 WL 1512036, at *2 (S.D.N.Y. Apr. 15, 2014) (quoting *Ford v. D.C. 37 Union Local 1549*, 579 F.3d 187, 188 (2d Cir. 2009)).  In deciding such a motion, the Court construes the complaint in the plaintiff's favor and accepts all factual allegations as true.  *Id.*  However, "[j]urisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it." *Ryan v. United States*, No. 15-CV-2248 (GHW), 2015 WL 7871041, at *3 (S.D.N.Y. Dec. 3, 2015) (quoting *APWU v. Potter*, 343 F.3d 619, 623 (2d Cir. 2003)).

In evaluating a Rule 12(b)(1) motion, "the Court may consider evidence outside the pleadings." *Id.*  "[P]laintiffs [may] come forward with evidence of their own to controvert that presented by the defendant if the affidavits submitted on a 12(b)(1) motion . . .  reveal the existence of factual problems in the assertion of jurisdiction." *Carter v. HealthPort Techs.*, LLC, 822 F.3d 47, 57 (2d Cir. 2016) (quotations omitted).  "However, the plaintiffs are entitled to rely on the allegations in the Pleading if the evidence proffered by the defendant is immaterial because it

does not contradict plausible allegations that are themselves sufficient to show standing." *Id.*

"Where, as here, the defendant moves for dismissal under Rule 12(b)(1), as well as on other grounds, the court should consider the Rule 12(b)(1) challenge first since if it must dismiss the complaint for lack of subject matter jurisdiction, the accompanying defenses and objections become moot and do not need to be determined." *L.M., et al. v. Johnson*, No. 14-CV-3833 (NGG) (VMS), 2015 WL 8540876, at *2 (E.D.N.Y. Dec. 7, 2015) (quoting *Rhulen Agency, Inc. v. Ala. Ins. Guar. Ass'n*, 896 F.2d 674, 678 (2d Cir. 1990)); *see also Gunn v. Ambac Assur. Corp.*, No. 11-CV-5497 (PAC) (JLC), 2012 WL 2401649, at *10 (S.D.N.Y. June 26, 2012), *adopted by* 2012 WL 3188849 (S.D.N.Y. Aug. 6, 2012).

### 2.   Motion To Dismiss For Failure To State A Claim Upon Which Relief Can Be Granted

Rule 12(b)(6) allows a party to move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).  In considering a Rule 12(b)(6) motion, the Court accepts all factual allegations in the complaint as true and draws all reasonable inferences in the plaintiff's favor.  *See Palin v. N.Y. Times Co.*, 940 F.3d 804, 809 (2d Cir. 2019) (quoting *Elias v. Rolling Stone LLC*, 872 F.3d 97, 104 (2d Cir. 2017)).

To survive dismissal, the plaintiff must allege enough facts "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  Facial plausibility exists when a plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556); *see also, e.g.*, *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) ("To survive dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'") (quoting *Twombly*, 550 U.S. at 555). Although Rule 8 of the Federal Rules of Civil Procedure "does not require 'detailed factual allegations,' . . . it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* (quoting *Twombly*, 550 U.S. at 555).

### 3.   Evidentiary Standard On A Motion To Dismiss Under Rule 12(b)(6)

On a motion to dismiss under Rule 12(b)(6), "district courts must limit their consideration to: (1) the factual allegations in the complaint, which are accepted as true; (2) documents attached to the complaint as an exhibit or incorporated in it by reference; (3) matters of which judicial notice may be taken; or (4) documents either in plaintiff's possession or of which plaintiff had knowledge and relied on in bringing suit." *Ebomwonyi*, 473 F. Supp. 3d at 344–45 (quoting *Roth v. CitiMortgage Inc.*, 756 F.3d 178, 180 (2d Cir. 2014)) (cleaned up).

For a document "[t]o be incorporated by reference, the complaint must make a clear, definite and substantial reference to [it]." *McLennon*, 171 F. Supp. 3d at 88 (quoting *Madu, Edozie & Madu, P.C. v. SocketWorks Ltd. Nigeria*, 265 F.R.D. 106, 123 (S.D.N.Y. 2010)) (citation omitted). "Limited quotation does not constitute

incorporation by reference." *Id.* at 88–89 (quoting *Looney v. Black*, 702 F.3d 701, 716 n.2 (2d Cir. 2012)). "Even where a document is not incorporated by reference, it may be considered if it is integral to the complaint." *Id.* at 89. "A document is integral to the complaint where the plaintiff (1) has actual notice of the document and its information and (2) has relied upon the documents in framing the complaint." *Id.* (citing *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002)) (cleaned up). "However, even if a document is integral to the complaint, it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (cleaned up).

The Federal Rules of Evidence establish that judicial notice may be taken of "a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201. "To that end, dictionaries and encyclopedia may be consulted." *B.V.D. Licensing Corp. v. Body Action Design, Inc.*, 846 F.2d 727, 728 (Fed. Cir. 1988). A court need not convert a motion to dismiss for failure to state a claim to one for summary judgment merely because it has considered extrinsic evidence for purposes of resolving a motion to dismiss for lack of subject matter jurisdiction. *See, e.g.*, *Magee v. Nassau Cnty. Med. Ctr.*, 27 F. Supp. 2d 154, 161 (E.D.N.Y. 1998).

## B. The Court Lacks Subject Matter Jurisdiction Over Free Holdings' Claims

The gravamen of Free Holdings' amended complaint is that its alleged

proprietary interest in "Namecoin-*Quantum*"—its term for the NFT it claims on
Namecoin—was injured by defendants' allegedly false statements that the record of
*Quantum* on Namecoin was "burned" or "removed" and their allegedly false
representation that the "NFT they sold at auction was the first NFT ever created."
AC ¶¶ 119–20, 142–43, 151–52.[12]  Defendants counter that those statements and
characterizations were not false, and that Free Holdings has failed to allege a
concrete injury resulting from them.  McCoy Mem. at 2; Sotheby's Mem. at 1, 17–18.
Thus, defendants move to dismiss for lack of subject matter jurisdiction.

### 1.  Free Holdings' Claims Are Not Justiciable

The Court first analyzes whether Free Holdings has alleged an injury
sufficient for standing under Article III of the U.S. Constitution.  As discussed
below, Free Holdings has alleged no concrete or particularized injury sufficient for
standing to sue in federal court.

### a.  Article III Standing and Ripeness

The Constitution limits the judicial power of federal courts to decide cases or
controversies.  *See* U.S. Const. art. III, § 2, cl. 1.  "Constitutional standing thus is
the threshold question in every federal case, determining the power of the court to

---

[12] Free Holdings's choice of terminology—"Namecoin-*Quantum*" and "Ethereum-
*Quantum*"—supports its view that there are two NFTs called *Quantum* and that it
has ownership rights to the one on Namecoin.  AC ¶¶ 1–2, 6.  This terminology is
not used in any of the exhibits Free Holdings attaches or in the sources to which it
cites.  Defendants alternatively refer to two Namecoin NFTs—a "2014 NFT" and a
"2021 NFT"—to support their position that Free Holdings' proprietary interest is in
a new, distinct NFT it created on Namecoin in 2021 when it claimed -709a.  *See,
e.g.*, McCoy Mem. at 19 n.7.  At the motion to dismiss stage, the Court, construing
the pleadings in Free Holdings' favor, refers to its terminology where it would not
cause confusion.

entertain the suit." *Quintanilla v. WW Int'l, Inc.*, 541 F. Supp. 3d 331, 339 (S.D.N.Y. 2021) (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975) (internal quotations omitted)). "The ripeness doctrine is drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction." *NYCLU v. Grandeau*, 528 F.3d 122, 130 (2d Cir. 2008).

Article III requires a plaintiff first to allege that it "suffered an injury in fact," *i.e.*, "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Wilhelm v. Beasley*, No. 15-CV-4029 (LAK), 2016 WL 94254, at *2 (S.D.N.Y. Jan. 7, 2016) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)); *see also SC Note Acquisitions, LLC v. Wells Fargo Bank, N.A.,* 934 F. Supp. 2d 516, 525 (E.D.N.Y. 2013) ("If a plaintiff has not yet suffered a concrete injury-in-fact, he or she . . . could also be said to suffer from a lack of ripeness . . . ."), *aff'd*, 548 F. App'x 741 (2d Cir. 2014). Injury-in-fact requires a "personal stake in the outcome of the controversy"—at a minimum, "a proprietary interest in[ ]the claim." *Cortlandt St. Recovery Corp. v. Hellas Telecommunications, S.a.r.l*, 790 F.3d 411, 417, 420 (2d Cir. 2015) (citing *W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP*, 549 F.3d 100, 108 (2d Cir. 2008) ("[T]he minimum requirement for an injury-in-fact is that the plaintiff have legal title to, or a proprietary interest in, the claim.")). The remaining requirements for Article III standing are "a causal connection between the injury and the conduct complained of" and a likelihood, "as opposed to mere[ ]speculati[on], that the injury will be redressed by a favorable decision." *Wilhelm*,

2016 WL 94254, at *2 (quoting *Lujan*, 504 U.S. at 560–61).

"Although the plaintiff must independently establish that it has standing to bring this action, and that its claim is ripe, the Court will analyze these inquir[i]es together because this case concerns whether plaintiff's injury is currently concrete, and not hypothetical, which implicates both standing and ripeness." *SC Note Acquisitions*, 934 F. Supp. 2d at 526. At the pleading stage, "[e]ach element of standing must be supported" at least by "general factual allegations of injury resulting from the defendant's conduct." *Sonterra Cap. Master Fund Ltd. v. UBS AG*, 954 F.3d 529, 534 (2d Cir. 2020) (cleaned up). As Free Holdings' allegations rely on its proprietary interest in *Quantum qua* name -709a, the analysis begins there.

### i.   Free Holdings Has Failed To Allege A Proprietary Interest In *Quantum*

Free Holdings claims a proprietary interest in "[t]he blockchain record for the Namecoin-*Quantum*," which, it alleges, "remains active and under [its] control." AC ¶ 69. The claim to -709a, under Free Holdings' theory of NFT ownership, confers a property interest in *Quantum* itself. *Id.*; *see also id.* ¶¶ 103–07. Notably, Free Holdings nowhere alleges an interest in the NFT minted on Ethereum that McCoy and Sotheby's sold. Indeed, it alleges that the two "are different NFTs." *Id.* ¶ 7. McCoy disputes Free Holdings' theory of ownership, arguing that a name on Namecoin is distinct from the underlying NFT. McCoy Mem. at 3 n.2. Thus, according to McCoy, Free Holdings merely claimed -709a, creating a distinct NFT, which confers no proprietary interest in *Quantum* itself. *See* McCoy Mem. at 4–7.

Free Holdings does provide an adequate factual basis to support a plausible proprietary interest in -709a—that is, assertions of title displayed on the -709a Record Page and by Twitter user @EarlyNFT. *See* AC ¶¶ 38, 42–43. Free Holdings has thus alleged a proprietary interest in -709a sufficient for standing. However, Free Holdings has not articulated any facts to support its claim to ownership of *Quantum* vis-à-vis its claim to -709a. As McCoy points out, Free Holdings "never alleges that it can or could control" *Quantum*. McCoy Mem. at 5. As factual support, Free Holdings provides only its own alleged statements on Namecoin that it "assert[ed] title to the file at the URL http://static.mccoyspace.com/gifs/quantum.gif" and that "[t]itle transfers to whoever controls this blockchain entry," -709a Record Page, along with an article explaining that the significance of name ownership on Namecoin is open to debate. *See* Pl. Mem. McCoy at 8 n.5 (citing Defining NFT); Dkt. No. 66, Ex. C (same); McCoy Mem. at 5, 12. Even taken together, they are insufficient to give rise to a legally-protected interest in *Quantum*.

### ii.   Free Holdings Has Failed To Allege Injury-In-Fact

Setting aside conclusory statements that merely recite the elements of the claims in the pleadings, the harm that Free Holdings alleges as a result of defendants' statements in Natively Digital, the challenged publication, consists of three theories: (1) loss of opportunity to profit from Sotheby's and McCoy's $1,472,000 sale; (2) damage to the value of its claimed Namecoin property; and (3) the expense of "$5,311.49 seeking to have McCoy and Sotheby's issue public

statements correcting their false and misleading claims."  AC ¶¶ 48, 139, 148, 158; *see also, e.g.*, *Iqbal*, 556 U.S. at 678 ("A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'") (quoting *Twombly*, 550 U.S. at 555).

In support of the first theory, Free Holdings points to the tweet from @EarlyNFT that it allegedly directed at McCoy's Twitter account asking, "Are you interested in the sale of Quantum or not then?"  AC ¶ 48.  Free Holdings argues that "[i]f McCoy had taken up this offer," its claimed Namecoin NFT "could have been included in McCoy's sale . . .  at the Sotheby's auction (and corrected related marketing statements)."  Pl. Mem. McCoy at 11.  But the pleadings raise no suggestion that defendants either were legally obligated to include Free Holdings in their auction sale, or that McCoy even responded to (or should have responded to) the cryptic offer made by an anonymous Twitter user.  And because no facts are alleged to suggest that Free Holdings had any claim to a share in the sale in the first place, there is no basis to support an inference that an injury occurred.

Regarding the second theory—damage to the value of its claimed Namecoin property—as McCoy points out, Free Holdings "does not allege any actual, imminent or attempted sale of [its claimed] NFT," nor that it "even *tried* to market it[ ]."  McCoy Mem. at 13–14 (emphasis in original).  Free Holdings' vague speculation that "[a]ny prospective purchaser of Namecoin-*Quantum* would now have valid reason to doubt [its] value," Pl. Mem. McCoy at 12, is legally insufficient. *See, e.g., ATSI Commc'ns*, 493 F.3d at 98 ("plaintiff must provide . . . factual

allegations . . . above the speculative level") (quoting *Twombly*, 550 U.S. at 555).

As to Free Holdings' alleged expenditure of $5,311.49 to have defendants issue public statements to correct the record, it is well-established that a plaintiff may not "manufacture standing merely by inflicting harm on [itself] based on . . . fears of hypothetical future harm that is not certainly impending." *Steven v. Carlos Lopez & Assocs., LLC*, 422 F. Supp. 3d 801, 807 (S.D.N.Y. 2019) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 402 (2013)), *aff'd sub nom.*, *McMorris v. Carlos Lopez & Assocs., LLC*, 995 F.3d 295 (2d Cir. 2021). This expenditure thus fails to give rise to standing.

While the Court is mindful that at the pleading stage, "general factual allegations of injury resulting from the defendant's conduct may suffice," Free Holdings has not pleaded *any* actual or imminent harm to its alleged proprietary interest. *Sonterra Cap. Master Fund*, 954 F.3d at 534 (citation omitted). Thus, Free Holdings has no Article III standing to bring the claims it has alleged in its amended complaint.

### C. The Amended Complaint Fails To State A Claim

Having concluded that Free Holdings has not alleged injury sufficient for standing, the Court does not need to consider, as a matter of law, whether the amended complaint states any claims. Nonetheless, both for completeness' sake and because of the novelty of the issues presented here, it will analyze each of Free Holdings' claims for relief to determine if any of them are cognizable. *See, e.g.*, *Desir v. Fla. Cap. Bank, N.A.*, 377 F. Supp. 3d 168, 174 (E.D.N.Y. 2019) (finding no

subject matter jurisdiction, but even assuming jurisdiction, analyzing whether complaint failed on 12(b)(6) grounds).[13]  For the reasons set forth below, the Court concludes that none are.  Free Holdings has not pleaded any viable cause of action against defendants that would otherwise survive a motion to dismiss, even if it were to establish standing.

### 1.  Free Holdings Has Failed To State A Claim Of Unjust Enrichment

As to its unjust enrichment claim, Free Holdings alleges that its Namecoin NFT "has significant value due to its status as the first NFT and such value is being significantly diminished by [defendants'] false and misleading statements."  AC ¶ 98; *see also id.* ¶¶ 110–16.  It argues that defendants were unjustly enriched when they "claimed the identity, titles, and prestige associated with the Namecoin-*Quantum* in order to market, promote, and sell [their own, separate] asset."  Pl. Mem. Sotheby's at 14.

"An unjust enrichment claim is rooted in the equitable principle that a person shall not be allowed to enrich himself unjustly at the expense of another."  *Georgia*

---

[13] Defendants have requested that all of Free Holdings' claims be dismissed with prejudice.  If the Court were to dismiss solely on subject matter jurisdiction grounds, the dismissal would be "without prejudice" as a matter of law.  *See, e.g.*, *Green v. Dep't of Educ. of City of New York*, 16 F.4th 1070, 1074 (2d Cir. 2021) (dismissals for lack of subject matter jurisdiction "must be without prejudice, rather than with prejudice").  However, dismissals for failure to state a claim are considered to be "with prejudice."  *See, e.g.*, *Lynch v. Hanley*, No. 21-CV-25 (GTS) (ML), 2021 WL 2309688, at *2 n.4 (N.D.N.Y. June 7, 2021) (dismissal for failure to state a claim viewed as adjudication "on the merits" of the action, and thus dismissal "with prejudice" appropriate) (collecting cases).

*Malone & Co. v. Rieder*, 19 N.Y.3d 511, 516 (N.Y. 2012) (cleaned up).[14]  "Thus, in order to adequately plead such a claim, the plaintiff must allege that (1) the other party was enriched, (2) at that party's expense, and (3) that it is against equity and good conscience to permit the other party to retain what is sought to be recovered." *Id.* (cleaned up).  While there is no dispute that defendants were enriched (they made a $1,472,000 sale), Free Holdings does not allege that it has any proprietary interest in the NFT that McCoy and Sotheby's sold.  McCoy Mem. at 15; AC ¶ 136. Moreover, Free Holdings has made no specific allegations that defendants' sale of an NFT (it does not even claim to own) was at its expense.  *See* AC ¶ 113 (alleging only that "McCoy and Sotheby's profits are obtained at Free Holdings' expense").

A viable unjust enrichment claim also requires some sort of connection between the plaintiff and defendants that would make the enrichment unjust. *Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 182 (N.Y. 2011) ("Although privity is not required for an unjust enrichment claim, a claim will not be supported if the connection between the parties is too attenuated.").  In *Georgia Malone & Co.*, for example, the court concluded that "arm's length business interactions" between the parties were "too attenuated" to meet this requirement.  19 N.Y.3d at 517–18.

The only connections alleged between the parties are based on Free Holdings' unsuccessful attempts to contact McCoy on Twitter using the handle @EarlyNFT,

---

[14] As Free Holdings brings New York law claims and the parties rely on New York law in their briefs, the Court will apply New York law.  *See, e.g., Great W. Ins. Co. v. Graham*, No. 18-CV-6249 (VSB), 2020 WL 3415026, at *17 n.17 (S.D.N.Y. June 22, 2020) (parties' agreement on applicable law "may be implied by the parties' reliance on [it] in their briefs") (citation omitted).

and its alleged phone conversation with Sotheby's' Moustakis, memorialized in an email to which she did not respond.  AC ¶¶ 44–50, 79–81.  The pleadings provide no information as to why McCoy should have even known who @EarlyNFT was, much less that it was Free Holdings.  *See generally* AC ¶¶ 44–51.  A single phone call followed by an unanswered email may safely be characterized as an "arm's length business interaction" and anonymous unanswered replies on one social media network constitutes no interaction at all.[15]  Nothing in the amended complaint can be construed as describing a sufficiently close relationship between the parties to support an unjust enrichment claim.

In addition, Free Holdings argues that it would be "against equity and good conscience" to allow "McCoy and Sotheby's to retain the profits they obtained through the sale of the Ethereum-*Quantum*."  AC ¶ 19.  From the pleadings, however, Free Holdings has demonstrated nothing more than an attempt to exploit open questions of ownership in the still-developing NFT field to lay claim to the profits of a legitimate artist and creator.  It does not allege that it took any part in the creation of *Quantum* or the blockchains used to record it.  Free Holdings has thus failed to plausibly allege that unjust enrichment occurred in these circumstances.

---

[15] *See, e.g.*, Merriam-Webster, "Interaction", https://www.merriam-webster.com/dictionary/interaction (last visited Mar. 16, 2023) ("mutual or reciprocal action or influence"); *see also, e.g.*, *Bilinski v. Keith Haring Found., Inc.*, 96 F. Supp. 3d 35, 52 (S.D.N.Y.) (connection insufficient for unjust enrichment purposes between owner of artwork and foundation refusing to authenticate it), *aff'd in part*, 632 F. App'x 637 (2d Cir. 2015).

**2. Free Holdings Has Failed To State Claims Of Slander Of Title Or Commercial Disparagement**

Free Holdings next alleges claims of slander of title and commercial disparagement based on its purported title on Namecoin.  AC ¶¶ 117–26, 140–48. For a viable slander of title claim, a plaintiff must adequately plead: "(1) a communication falsely casting doubt on the validity of [its] title, (2) reasonably calculated to cause harm [(in other words, malice)], and (3) resulting in special damages."  *Chamilia, LLC v. Pandora Jewelry, LLC*, No. 04-CV-6017 (KMK), 2007 WL 2781246, at *11 (S.D.N.Y. Sept. 24, 2007); *see also Wei Su v. Sotheby's, Inc.*, No. 17-CV-4577 (VEC), 2019 WL 4917609, at *3 (S.D.N.Y. Oct. 4, 2019) ("[T]he claimant must plausibly allege that the offending party maliciously used false statements to cast doubt upon another's property interest, causing special damages, typically in the form of a lost sale resulting from the cloud on the claimant's title.").  Likewise, "product disparagement consists of: (1) a false statement; (2) published by Defendant to a third party; (3) with malice; and (4) with special damages." *Chamilia,* 2007 WL 2781246, at *18 (citing cases).  Where a plaintiff "has merely parroted the applicable legal standard" or fails to plead any facts suggesting malice, a slander of title claim will be dismissed.  *Horton v. Wells Fargo Bank N.A.*, No. 16-CV-1737 (KBF), 2016 WL 6781250, at *7 (S.D.N.Y. Nov. 16, 2016), *aff'd,* 703 F. App'x 23 (2d Cir. 2017); *see also Aleem v. Experience Hendrix, L.L.C.*, No. 16-CV-9206 (ER), 2017 WL 3105870, at *7 (S.D.N.Y. July 20, 2017) (plaintiffs failed to "submit any facts to suggest . . . purported communications . . . made with malice"). For either claim to survive, Free Holdings must therefore plausibly allege falsity,

malice, and special damages.  The Court analyzes them seriatim.

> ### i.    Free Holdings Has Not Alleged Falsity

The burden is on a plaintiff to allege "that the complained of statement is

substantially false."  *Tannerite Sports, LLC v. NBCUniversal News Grp.*, 864 F.3d

236, 242 (2d Cir. 2017); *Franklin v. Daily Holdings, Inc.*, 135 A.D.3d 87, 94 (1st

Dep't 2015) (if statement "is substantially true," claim should be dismissed)

(quotation omitted).  "[E]xpressions of pure opinion . . . are not actionable."  *Restis v.*

*Am. Coal. Against Nuclear Iran, Inc.*, 53 F. Supp. 3d 705, 718 (S.D.N.Y. 2014)

(citing *Torain v. Liu*, 279 Fed. App'x 46, 46 (2d Cir. 2008)).

Free Holdings has failed to meet its burden for several reasons.  First, it

concedes that the representations it challenges—that *Quantum* was "burned" or

"removed" from the Namecoin blockchain and that the NFT sold at auction "was the

first NFT ever created," AC ¶¶ 119–20—are topics of debate.  It alleges that

"Namecoin-*Quantum* . . . has not been 'burned,' and is currently controlled and

owned by Free Holdings," AC ¶¶ 123, 146, but goes on to contradict that allegation

in its own pleadings and in the materials it cites.  Specifically, Free Holdings

admits that the NFT McCoy created on Namecoin "expire[d]," AC ¶¶ 3, 40, yet it

also observes that "defining the legal import of control of digital assets on the

Namecoin blockchain[ ]is the subject of differing opinions."  Pl. Mem. McCoy at 8.[16]

---

[16] Sotheby's urges the Court to take judicial notice of "news articles showing there is
an existing debate about the range of potential definitions of these terms."
Sotheby's Mem. at 14 n.6 (citing *Condit v. Dunne*, 317 F. Supp. 2d 344, 357
(S.D.N.Y. 2004) (in granting dismissal motion, taking judicial notice of newspaper
articles showing public controversy in order "to place [defendants'] comments in the

Further, it cites and attaches to its motion papers an article explaining that "[w]hen a Namecoin domain expires, . . . it can be called 'burnt.'"  Defining NFT.

Second, Free Holdings uses terminology that is misleading and fails to show falsity.  It alleges that as "Namecoin-*Quantum* is considered the first NFT ever created," AC ¶ 37, Sotheby's falsely marketed "Ethereum-*Quantum* by Kevin McCoy . . . as the first NFT ever created."  AC ¶ 120; *see also* Pl. Mem. Sotheby's at 10 ("the pleaded truth would . . . reveal[ ] to potential bidders that the Ethereum-*Quantum* was a copy of the presently-extant Namecoin-*Quantum*, rather than the alleged sole surviving vestige of a prized digital collectible.").  Its allegations never quote defendants—or anyone else—stating that "Ethereum-*Quantum*" was the first NFT created.  *See, e.g.*, AC ¶¶ 54–74.  "Ethereum-*Quantum*" and "Namecoin-*Quantum*" are terms Free Holdings employs in its pleadings, and there is no evidence to suggest that defendants or anyone else ever used them in any public statements or challenged materials.  Indeed, the statements Free Holdings cites to in its amended complaint—by defendants and others—characterize *Quantum* as the first NFT ever created, and do not distinguish between an "Ethereum-*Quantum*" and "Namecoin-*Quantum*."  *See* AC ¶ 58 ("Kevin McCoy's *Quantum* is such a work.  Minted on 2nd May 2014 21:27:35, or more precisely Namecoin block 174923, the NFT era quietly dawned."); ¶ 86 ("First ever crypto art nft – Quantum has arrived chez Sillytuna"); ¶ 95 ((citing Gopnik) ("That first NFT that Kevin created, which he'd attached to a modest digital abstraction titled 'Quantum,' sold last June at Sotheby's for $1.4

broader social context.")).  The Court need not do so because, as noted, Free Holdings has conceded as much.

million."); ¶ 97 ("FIRST-EVER NFT 'QUANTUM' SOLD FOR $1.47 MILLION").

Furthermore, Free Holdings nowhere disputes that "McCoy and Sotheby's accurately reported that *Quantum* was originally minted in 2014 on the Namecoin blockchain, and that McCoy 'moved the original on-chain data from a burned Namecoin token into a modern, industry standard, ERC 721 token, while preserving all of the original on-chain information.'" Sotheby's Mem. at 18 (citing Rothstein Decl., Ex. F.). Instead, it argues only that defendants purveyed a false "overall impression" that "Namecoin-*Quantum* did not exist," without citing any authority for its position that the "overall impression" of defendants' statements is to be considered in the falsity analysis. *See* Pl. Mem. Sotheby's at 11 (citing only *Ackerman v. Coca-Cola Co.,* No. 09-CV-395 (JG), 2010 WL 2925955, at *17 (E.D.N.Y. July 21, 2010) (does not address slander of title or commercial disparagement claims)). Moreover, defendants did not convey an "overall impression . . . that Namecoin-*Quantum* did not exist," because they actually explained *Quantum*'s blockchain history multiple times in Natively Digital. Pl. Mem. Sotheby's at 11. For instance, the description explains that the work was "[o]riginally minted on May 3, 2014 on Namecoin blockchain, and preserved on a token minted on May 28, 2021 by the artist," Natively Digital—a recounting consistent with Free Holdings' view that "Ethereum-*Quantum* is definitively not the world's first NFT." Pl. Mem. Sotheby's at 10. The Condition Report on Natively Digital explains that the NFT for auction "was minted May 2021, but the referenced pieces were originally made public in 2014, with a link to the image hosted on the

34

Namecoin network," and in one of his videos on Natively Digital, McCoy explains

precisely how the "provenance chain . . . begins on Namecoin but now is irrevocably

transferred to this more modern and stable specification on the Ethereum

blockchain." *Quantum* Token – McCoy Tr. at 3:23–4:2.

Moreover, by Free Holdings' own allegations, it was not false for McCoy to

explain that "the nature of [*Quantum*] lies in the immutable engraving of

information to the Namecoin blockchain" and that it was based on his "idea to use

blockchain technology to create indelible provenance and ownership of digital

images of this kind." AC ¶¶ 56–57. In fact, Free Holdings acknowledges that

*Quantum* was created by McCoy, and that it was the first NFT. AC ¶¶ 36–37. Its

position is that it claims title to an "indelible" record of *Quantum* on Namecoin, Pl.

Mem. McCoy at 16–17, but, as discussed above, it does not claim title to the record

of *Quantum* maintained on Ethereum. AC ¶ 38. Free Holdings has thus failed to

sufficiently allege that any statements made by McCoy or Sotheby's were

substantially false.

### ii.    Free Holdings Has Not Alleged Malice

As applicable here, malice requires a showing that defendants "either knew

[their] statements were false or acted with reckless disregard as to whether they

were false." *Conti v. Doe*, 535 F. Supp. 3d 257, 279 (S.D.N.Y. 2021); *see also*

*Chamilia*, 2007 WL 2781246, at *11 (New York courts apply "actual malice"

standard to slander of title claims). A plaintiff fails to allege malice where it has

not submitted any facts to suggest that the challenged statements were "made with

malice or that they were false." *Aleem*, 2017 WL 3105870, at *7.

Free Holdings has not pleaded any facts supporting even an inference of malice on the part of Sotheby's or McCoy. The allegations that defendants have not "issue[d] corrective public statements" and that they "maintain that" their statements are not false do not suggest malice because, as discussed, defendants do not believe their statements were false. AC ¶¶ 121, 144. As previously observed, Free Holdings concedes that reasonable minds believe defendants' understanding of *Quantum*'s ownership. *See* Defining NFT ("When a Namecoin domain expires, . . . it can be called 'burnt.'") (one of three interpretations of re-registered name on Namecoin). This falls well short of malice. *See, e.g. Fink v. Shawangunk Conservancy, Inc.*, 15 A.D.3d 754, 756 (3d Dep't 2005) ("We find no evidence of the malicious intent necessary to support a cause of action for slander of title and, given our conclusion that defendant had probable cause to claim title to the disputed property, these public assertions cannot be said to have been made 'with a reckless disregard for their truth or falsity.'").

### iii.   Free Holdings Has Not Alleged Damages

Finally, a valid cause of action for slander of title or commercial disparagement requires an allegation of special damages, "typically . . . a lost sale resulting from the cloud on the claimant's title." *Wei Su*, 2019 WL 4917609, at *3; *see also, e.g. Kirby v. Wildenstein,* 784 F. Supp. 1112, 1116 (S.D.N.Y. 1992) ("The rules surrounding the pleading and proof of special damages are stringent and well-articulated[: they] are limited to losses having pecuniary or economic value, and

must be fully and accurately stated, with sufficient particularity to identify actual losses." (cleaned up)); *Rosenbaum v. City of New York,* 8 N.Y.3d 1, 12 (N.Y. 2006) ("[A] cause of action does not arise until special damages actually result."). A plaintiff must both name "the individuals who ceased to be customers, or who refused to purchase, and itemize the exact damages." *Bilinski v. Keith Haring Found., Inc.*, 632 F. App'x 637, 641 (2d Cir. 2015) (citations omitted). Free Holdings has done neither. It alleges only that the "value" of its Namecoin property "is being significantly diminished by the false and misleading statements made by McCoy and Sotheby's," AC ¶ 98, and that it "expended $5,311.49 seeking to have McCoy and Sotheby's issue public statements correcting their false and misleading claims." AC ¶¶ 100, 126. It does not state a specific lost value, an estimated worth of its claimed NFT, or any specific lost sales opportunities. Moreover, "legal fees and executive time, standing alone[,] do not comprise special damages." *Angio-Med. Corp. v. Eli Lilly & Co.*, 720 F. Supp. 269, 274 (S.D.N.Y. 1989). Free Holdings has thus "not provide[d] sufficient factual support to establish [it is] entitled to special damages." *Aleem*, 2017 WL 3105870, at *7.[17] For all these reasons, it has failed to state a claim for slander of title or commercial disparagement.

### 3. Free Holdings Has Failed To State A Claim For Deceptive And Unlawful Trade Practices Under N.Y. G.B.L. § 349

Section 349 of the New York General Business Law prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the

---

[17] Sotheby's further argues that its statements are protected opinions under the First Amendment. *See, e.g.*, Sotheby's Mem. at 11–17. As the Court concludes that Free Holdings has failed to state claims for slander of title and commercial disparagement on other grounds, it need not reach the constitutional issue.

furnishing of any service." N.Y. G.B.L. § 349(a).  It requires a showing that "(1) defendant engaged in a consumer-oriented act, (2) that the consumer-oriented act was misleading in a material way, and (3) that plaintiff consequently suffered injury." *RCA Trademark Mgmt. S.A.S. v. VOXX Int'l Corp.*, No. 14-CV-6294 (LTS) (HBP), 2015 WL 5008762, at *3 (S.D.N.Y. Aug. 24, 2015) (citation omitted).  It is well-established that a "single shot transaction involving complex arrangements, knowledgeable and experienced parties and large sums of money is not a consumer-oriented transaction." *4 K & D Corp. v. Concierge Auctions, LLC*, 2 F. Supp. 3d 525, 548 (S.D.N.Y. 2014) (collecting cases) (cleaned up).

Furthermore, the scope of § 349 is "limited to the types of offenses to the public interest that would trigger Federal Trade Commission intervention under 15 U.S.C. § 45, such as potential danger to the public health or safety." *DO Denim, LLC v. Fried Denim, Inc.,* 634 F. Supp. 2d 403, 409 (S.D.N.Y. 2009); *see also Gucci Am., Inc. v. Duty Free Apparel, Ltd.*, 277 F. Supp. 2d 269, 273 (S.D.N.Y. 2003) ("It is clear that the gravamen of the complaint must be consumer injury or harm to the public interest." (cleaned up) (quoting *Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 264 (2d Cir. 1995)).  Corporate competitors may bring a claim under this statute "so long as some harm to the public at large is at issue," but "courts routinely reject" such claims where "the gravamen of the complaint is harm to plaintiff's business as opposed to the public interest in New York at large." *Gucci Am.,* 277 F. Supp. 2d at 273–74.

Free Holdings presses that there are exceptions to the bar on "single-shot"

transactions and that this suit presents a harm to the public interest because "New York's Department of Financial Services, . . . [is] planning to issue new guidance on how its rules apply to NFTs."  Pl. Mem. McCoy at 20 n.7.  But it provides no applicable authority as to why the "single-shot" transaction here nor the sale of fine art at a preeminent auction house is the kind of harm to the public interest contemplated by § 349.  In fact, courts have routinely declined to apply § 349(a) in analogous circumstances.  *See, e.g.*, *4 K & D Corp.*, 2 F. Supp. 3d at 549 (competitor failed to allege "facts to show . . . luxury real estate transactions" affected "consumers at large"); *904 Tower Apartment LLC v. Mark Hotel LLC*, 853 F. Supp. 2d 386, 400 (S.D.N.Y. 2012) ("A transaction over $10 million in real estate, about which the alleged deceptive practices sound primarily in breach of, and fraudulent inducement into, contracts negotiated by counsel, is too unlike a typical consumer violation to be covered under the statute."); *Gottlieb Dev. LLC v. Paramount Pictures Corp.*, 590 F. Supp. 2d 625, 637 (S.D.N.Y. 2008) ("Although [plaintiff] insists [defendant's] conduct has ramifications for consumers at large, it has not furnished anything more than conclusory and speculative allegations about how the public will be deceived as to the affiliation or endorsement of its products.").

Additionally, the "gravamen" of Free Holdings' amended complaint is plainly the alleged harm to its business, not to the public.  *See, e.g.*, AC ¶ 139 ("The value of the Namecoin-*Quantum* NFT owned by Free Holdings has been significantly damaged as a result of all Defendants' statements and conduct.").  It has thus failed to state a claim under § 349.

### 4. Free Holdings Has Failed To State A Claim Under Section 43(a) Of The Lanham Act

To bring a claim under § 43(a) of the Lanham Act, a plaintiff must allege that (1) the statement it challenges is either "literally false" or "likely to confuse or deceive consumers;" (2) the "defendant misrepresented an inherent quality or characteristic of a good or service;" (3) "the defendant placed the false or misleading statement in interstate commerce;" and (4) "the plaintiff was injured as a result of the defendant's misrepresentation, either by a diversion of business or a loss of goodwill associated with the plaintiff's goods or services." *Davis v. Avvo, Inc.*, 345 F. Supp. 3d 534, 539–40 (S.D.N.Y. 2018) (citing *Merck Eprova AG v. Gnosis S.p.A.*, 760 F.3d 247, 255 (2d Cir. 2014)).

A statement is "literally false" only if its message is "unambiguous" and not "susceptible to more than one reasonable interpretation." *Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 158 (2d Cir. 2007) (citations omitted); *Lokai Holdings, LLC v. Twin Tiger USA, LLC*, 306 F. Supp. 3d 629, 638 (S.D.N.Y. 2018) ("[I]f the representation is susceptible to more than one reasonable interpretation, the advertisement cannot be literally false, and the advertisement is actionable only upon a showing of actual consumer confusion." (citation omitted)).  As has already been discussed, it was not literally false to say that *Quantum* was the "first-ever" NFT, nor that the NFT McCoy created was "burned" or "removed" from the Namecoin blockchain because, by Free Holdings' own submissions, that is only one interpretation of what happens when names expire on Namecoin.  *See, e.g.*, Pl. Mem. McCoy at 8 ("defining the legal import of control of digital assets on the

40

Namecoin blockchain[ ]is the subject of differing opinions"); Defining NFT (three interpretations of re-registered name on Namecoin).

Moreover, Free Holdings has not alleged any "diversion of business or a loss of goodwill" in its own proprietary interest, because it does not allege to have had any business or goodwill in *Quantum* in the first place. *See* AC ¶¶ 149–58; ¶ 158 (alleging only that statements "caused damage to Free Holdings in an amount to be determined at trial, but not less than $1,472,000"); *see also, e.g.*, *Davis*, 345 F. Supp. 3d at 544 (no fact allegations of any lost business, *inter alia*, resulting in failed § 43(a) claim). It has thus failed to state a claim under § 43(a).

### 5. The Court Declines To Issue A Declaratory Judgment

Finally, Free Holdings requests a declaratory judgment that: "(a) [it] is the rightful owner of the Namecoin-*Quantum*; (b) [that] Namecoin-*Quantum* has not been 'burned' or otherwise 'removed' from the Namecoin blockchain; and [that] (c) the statements issued by McCoy and Sotheby's in connection with their sale of the Ethereum-*Quantum* were false and misleading." AC ¶ 109. But a court may only exercise its declaratory judgment authority where there is an "actual controversy" and where the plaintiff "provide[s] a substantive claim to relief based on a law other than the Declaratory Judgment Act." *Hello I Am Elliot, Inc. v. Sine*, No. 19-CV-6905 (PAE), 2020 WL 3619505, at *11 (S.D.N.Y. July 2, 2020); *see also Dow Jones & Co. v. Harrods, Ltd.*, 237 F. Supp. 2d 394, 406 (S.D.N.Y. 2002), ("[Declaratory judgment] actions are justiciable only in cases in which an 'actual controversy' exists." (citing 28 U.S.C. § 2201(a))), *aff'd*, 346 F.3d 357 (2d Cir. 2003).

An actual controversy requires a "disagreement [that has] taken on fixed and final shape so that a court can see what legal issues it is deciding, what effect its decision will have on the adversaries, and some useful purpose to be achieved in deciding them." *AARP v. 200 Kelsey Assocs., LLC*, No. 06-CV-81 (SCR), 2009 WL 47499, at *4 (S.D.N.Y. Jan. 8, 2009) (cleaned up). It may not involve claims relying on "contingent future events that may not occur as anticipated, or indeed may not occur at all." *Id.*

As the Court has already discussed, Free Holdings' pleadings fail to give rise to an "actual controversy" because it has not alleged any concrete or particularized injury stemming from defendants' representations. *See KM Enterprises, Inc. v. McDonald*, No. 11-CV-5098 (ADS) (ETB), 2012 WL 4472010, at *19 (E.D.N.Y. Sept. 25, 2012) ("[T]he statute that authorizes the declaratory judgment remedy expressly incorporates the Article III case or controversy limitation."), *aff'd*, 518 F. App'x 12 (2d Cir. 2013). Moreover, there is no "independent substantive claim to support a declaratory judgment" here, as Free Holdings has failed to state any plausible legal claim. *See, e.g.*, *Johnson v. Magnolia Pictures LLC*, No. 18-CV-9337 (VB), 2019 WL 4412483, at *3 (S.D.N.Y. Sept. 16, 2019) (no independent substantive basis for declaratory judgment where court dismissed claim); *KM Enterprises*, 2012 WL 4472010, at *19 ("As . . . the only remaining causes of action in the Amended Complaint [are] for a declaratory judgment and an injunction[,] Plaintiff cannot survive a motion to dismiss by relying on these claims as independent causes of action." (cleaned up)). Declaratory relief is thus inappropriate.

### III.  CONCLUSION

For the reasons stated herein, the Court grants the motions to dismiss the amended complaint.  Accordingly, the Clerk is directed to mark the motions at docket numbers 54 and 59 as "granted" and enter judgment for defendants.

**SO ORDERED.**

Dated: March 17, 2023
      New York, New York

JAMES L. COTT
United States Magistrate Judge